Opinion issued December 11, 2018



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-18-00318-CR

_____

**MATTHEW LYNN HAIRGROVE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 248th District Court**
**Harris County, Texas**
**Trial Court Case No. 1556769**

---

## MEMORANDUM OPINION

Appellant, Matthew Lynn Hairgrove, was indicted for the felony offense of aggravated robbery. The jury found appellant guilty of the lesser-included offense of aggravated assault and, after finding the enhancement allegation true, assessed his punishment at fifteen years' confinement. In two points of error, appellant contends

that the trial court erred in denying his request to submit instructions to the jury on the lesser-included offenses of robbery and misdemeanor assault. We affirm.

## Background

On June 17, 2017, Christian Bankhead, his girlfriend, Keeley Price, Keeley's mother, Melissa Price, and appellant, Melissa's boyfriend, traveled to Marshall, Texas, to visit Melissa's mother, who had been ill. Melissa drove, appellant sat in the passenger seat, Christian sat in the rear driver's seat behind Melissa, and Keeley sat in the rear middle seat next to Christian. During the trip, Christian noticed that appellant had a baseball bat on his lap, and that he was carving it with a knife.

The next day, on their way back to Houston, they stopped at appellant's father's house in Henderson, Texas. While appellant and Melissa visited with appellant's father, Christian and Keeley remained in the car. When appellant and Melissa returned to the car, Christian noticed that appellant was carrying a long gun bag containing what was later identified as a shotgun. Appellant got into the car and placed the gun bag next to him. When Christian asked appellant why he had a shotgun, appellant "said something about dove hunting or bird hunting[.]"

Back in Houston, appellant and Melissa dropped Keeley off at her father's house before taking Christian home. Christian thought it was "weird" because his home was closer than Keeley's father's house, but he "just brushed it off." Christian testified that, after they left Keeley, Melissa continued driving and talked with

2

appellant when they suddenly said, "right now," and Melissa slammed on the brakes. Appellant, who was sitting in the passenger seat, turned around and started "throwing punches" at Christian. Appellant punched Christian from his waistline to the top of his head, with the punches landing mainly on his arms and his head. Christian testified that when appellant punched him, it felt like a "metal bar" or a "metal pole" had struck him. Christian saw that appellant had silver-colored brass knuckles on his hand.

Christian began punching appellant back. When he did, appellant picked up the bat. Due to the confined space in the car, appellant was unable to swing the bat but he hit and jabbed Christian in the head and the arms with the bat in a "spear fish[ing]" motion. Christian testified that he pressed himself against the car door in an effort to take the blunt force of the bat with his arms.

When appellant stopped striking him with the bat, Christian tried to escape but was unable to open the door. Christian testified that when he turned around again, appellant pointed a shotgun in his face. Appellant then hit Christian on the right side of his face with the shotgun, told Christian that he was going to "smoke" him, and cocked the shotgun. Christian testified that, while he was being struck with the brass knuckles, the bat, and the shotgun, he thought he was going to die. Melissa then grabbed the shotgun and she and appellant began yelling at each other.

Appellant then demanded Christian's phone. When Christian told him that it was in his backpack, appellant grabbed the backpack and threw it on the passenger side front floorboard. While pointing the shotgun in Christian's face, he ordered Christian to remove his shirt and pants and to get out of the car. When Christian was unable to exit the car, appellant got out, opened Christian's door, and yanked him out of the car. Appellant told Christian that if he told anyone what had happened, appellant would come back and "smoke" Christian and his father. Appellant got back into the car and Melissa "floored it" and drove away. Christian walked to his father's house, and his father called the police.

As a result of the attack, Christian sustained a large gash to his head, a laceration to his hand and one to his ear where his earring had been ripped out, and bruises to his chest and neck. Emergency medical personnel evaluated Christian's injuries and told him that although he "could have used stitches" for the gash on his head, they were unable to apply them because the injury was a tear rather than a cut. When Officer Michael Turner with the Pasadena Police Department arrived, he observed that Christian was covered in blood "pretty much head to toe . . . on his face, head, arms and legs, chest, [and] torso." Detective Wright, a sixteen-year veteran of the Pasadena Police department, testified that a baseball bat is not designed to be a deadly weapon but that, based on her experience, "[a]ll it takes is a strike in the right place in the head to kill a person with a baseball bat."

Keeley testified that she noticed that appellant was carrying a shotgun as they left appellant's father's house to drive back to Houston. Keeley further testified that she thought it was "a little weird" that her mother and appellant decided to drop Keeley off first before Christian because "normally when [she] bring[s] someone they get dropped off first[.]" Later that night, Christian's father called Keeley and told her what had happened.

Bobby Hairgrove, appellant's father, testified that he owns five shotguns, he keeps them in a locked safe in his house, and it would not have been possible for appellant to take a shotgun from his home. He testified that he walked appellant and Melissa to the car after their visit and that he would have seen a shotgun if appellant had taken one with him.

Toward the end of trial, trial counsel requested that the jury be instructed on the lesser offenses of aggravated assault, robbery, and Class A misdemeanor assault. The trial court instructed the jury on the charged offense of aggravated robbery and the lesser-included offense of aggravated assault, but it denied the requested instructions on robbery and misdemeanor assault. The jury found appellant guilty of the lesser-included offense of aggravated assault and assessed his punishment at fifteen years' confinement.

## Discussion

In his first and second points of error, appellant contends that the trial court erred in denying his request to submit instructions to the jury on the lesser-included offenses of robbery and Class A misdemeanor assault.

### A. Standard of Review and Applicable Law

Article 37.08 of the Texas Code of Criminal Procedure provides that "[i]n a prosecution for an offense with lesser included offenses, the jury may find the defendant not guilty of the greater offense, but guilty of any lesser included offense." TEX. CODE CRIM. PROC. ANN. art. 37.08. We apply a two-step analysis to determine whether an instruction on a lesser-included offense should be included in the jury charge. *See State v. Meru*, 414 S.W.3d 159, 162 (Tex. Crim. App. 2013); *Hall v. State*, 225 S.W.3d 524, 535–36 (Tex. Crim. App. 2007).

First, we compare the elements of the offense as charged in the indictment with the elements of the asserted lesser-included offense. *See Meru*, 414 S.W.3d at 162; *Hall*, 225 S.W.3d at 535–36. This step is a question of law and does not depend on evidence adduced at trial. *See Hall*, 225 S.W.3d at 535. An offense is a lesser-included offense of the charged offense if the indictment for the greater-inclusive offense either (1) alleges all of the elements of the lesser-included offense, or (2) alleges elements plus facts from which all of the elements of the lesser-included offense may be deduced. *See* TEX. CODE CRIM. PROC. ANN. art.

6

37.09(1). If the elements of the lesser-included offense can be deduced from facts alleged in the indictment, they need not be pled in the indictment. *See Ex parte Watson*, 306 S.W.3d 259, 273 (Tex. Crim. App. 2009) (per curiam).

If the analysis under the first step supports a determination that the requested lesser offense is a lesser-included offense, then we consider "whether a rational jury could find that, if the defendant is guilty, he is guilty only of the lesser offense." *Meru*, 414 S.W.3d at 162–63. "[A]nything more than a scintilla of evidence may be sufficient to entitle a defendant to a charge on a lesser offense." *Cavazos v. State*, 382 S.W.3d 377, 385 (Tex. Crim. App. 2012) (citing *Hall*, 223 S.W.3d at 536). However, "the evidence produced must be sufficient to establish the lesser-included offense as a 'valid, rational alternative' to the charged offense." *Id.* (quoting *Hall*, 225 S.W.3d at 536). "While it is true that the evidence may be weak or contradicted, the evidence must still be directly germane to the lesser-included offense and must rise to a level that a rational jury could find that if [the defendant] is guilty, he is guilty only of the lesser-included offense." *Id.* "Meeting this threshold requires more than mere speculation—it requires affirmative evidence that both raises the lesser-included offense and rebuts or negates an element of the greater offense." *Id.*

A person commits robbery "if, in the course of committing theft . . . and with intent to obtain or maintain control of the property, he . . . intentionally, knowingly, or recklessly causes bodily injury to another." TEX. PENAL CODE ANN. § 29.02(a)(1).

7

A person commits aggravated robbery "if he commits robbery . . . and he uses or exhibits a deadly weapon[.]" *Id.* § 29.03(a)(2). A person commits assault if he "intentionally, knowingly, or recklessly causes bodily injury to another[.]" *Id*. § 22.01(a)(1). A person commits aggravated assault if the person commits assault and "uses or exhibits a deadly weapon during the commission of the assault." *Id*. § 22.02(a)(2).

"Deadly weapon" means "a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury . . . or anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 1.07(17). Factors that a jury may consider in determining whether an object is a deadly weapon under this second definition include (1) words of the accused; (2) the intended use of the weapon; (3) the size and shape of the weapon; (4) testimony by the victim that he feared death or serious bodily injury; (5) the severity of any wounds inflicted; (6) the manner in which the assailant allegedly used the object; (7) physical proximity of the parties; and (8) testimony as to the weapon's potential for causing death or serious bodily injury. *See Romero v. State*, 331 S.W.3d 82, 83 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). "Serious bodily injury" means "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or

8

impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46) (West 2014).

Texas courts have concluded that brass knuckles and baseball bats, like any object, may constitute deadly weapons where the evidence shows that the object was used in a manner capable of causing serious injury or death. *See, e.g.*, *Babcock v. State*, 501 S.W.3d 651, 655 (Tex. App.—Eastland 2016, pet. ref'd) (concluding rational jury could have found that tree branch was deadly weapon because evidence indicated that branch was two to three feet long, defendant swung it as he ran toward complainant, and that if complainant had been hit with branch, he would have been knocked unconscious and probably killed); *English v. State*, 171 S.W.3d 625, 628 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (holding evidence was sufficient to support conclusion that baseball bat constituted deadly weapon where defendant swung bat at victim's head with full force, and resulting blow to victim's head caused large gash and concussion, and defendant told victim he intended to kill him); *see also White v. State*, No. 01-12-00087-CR, 2013 WL 4210827, at *17 (Tex. App.— Fort Worth Aug. 15, 2013, no pet.) (mem. op., not designated for publication) (concluding jury could have found that homemade spear, composed of staple and paper, was deadly weapon where evidence showed defendant used it to jab correctional officer in cheek because evidence showed object was capable of puncturing skin and causing injury, from damage to unprotected eye to infection

with terminal disease); *Chambers v. State*, No. 05-92-00547-CR, 1993 WL 25375, at *2–3 (Tex. App.—Dallas Jan. 29, 1993, pet. ref'd) (per curiam) (not designated for publication) (concluding evidence was sufficient to permit rational trier of fact to find that brass knuckles used by defendant constituted deadly weapon where defendant hit complainant in mouth with brass knuckles, complainant sustained split lip, and paramedics recommended that complainant receive stiches on his lip). "The State need not establish that the use or intended use of an implement actually *caused* death or serious bodily injury; only that 'the manner' in which it was either used or intended to be used was 'capable' of causing death or serious bodily injury." *Moore v. State*, 520 S.W.3d 906, 908 (Tex. Crim. App. 2017) (emphasis in original).

## B. Analysis

The indictment alleged that appellant

> on or about JUNE 18, 2017, did then and there unlawfully, while in the course of committing theft of property owned by Christian Bankhead, and with intent to obtain and maintain control of the property, intentionally and knowingly cause bodily injury to Christian Bankhead, and [appellant] did then and there use and exhibit a deadly weapon, namely, a shotgun, a bat and brass knuckles.

The charged offense was aggravated robbery, the trial court instructed the jury on the lesser-included offense of aggravated assault, and the jury found appellant guilty of aggravated assault.

Assault is a lesser-included offense of robbery. To prove assault, the State must prove that the defendant "intentionally, knowingly, or recklessly cause[d]

10

bodily injury to another[.]" TEX. PENAL CODE §22.01(a)(1). To prove robbery, the State must prove that the defendant, "in the course of committing theft . . . and with intent to obtain or maintain control of the property, . . . intentionally, knowingly, or recklessly cause[d] bodily injury to another[.]" *Id.* § 29.02(a)(1). To prove either aggravated assault or aggravated robbery, the State had to prove the underlying offense plus the use or exhibition of a deadly weapon. *See id.* §§ 22.02(a)(2), 29.03(a)(2).

As alleged in the indictment, the only distinction between the offenses of aggravated robbery and robbery and between the offenses of aggravated assault and misdemeanor assault, is appellant's use and exhibition of a deadly weapon. The State acknowledges that, as alleged in the indictment, the offenses of robbery, aggravated assault, and misdemeanor assault constitute lesser offenses of aggravated robbery.

We must now determine whether a rational jury could find that, if appellant is guilty, he is guilty only of the lesser offense of robbery or the lesser offense of misdemeanor assault. To be entitled to an instruction on robbery or misdemeanor assault, the record must contain some affirmative evidence that would have permitted a rational jury to find the underlying offense (robbery or assault) and also that appellant did not exhibit and use a deadly weapon in committing the attack, as required for both aggravated robbery and aggravated assault. Specifically, there

11

must be affirmative evidence either that appellant had no weapon or that he did not use the shotgun, the bat, or the brass knuckles in a manner capable of causing serious bodily injury or death. *See Cavazos*, 382 S.W.3d at 385.

Appellant argues that, while a shotgun is a deadly weapon per se, there is affirmative evidence showing that appellant did not have a shotgun. In support of his argument, appellant points to his father's testimony that appellant did not take a shotgun from his house, it was not possible for appellant to have snuck a shotgun out of his house, and he did not notice a shotgun in the car. Appellant's father's testimony is some evidence that appellant did not have a shotgun. *See id.*

Appellant also argues that Christian's testimony raised serious doubts about whether the baseball bat and brass knuckles constituted deadly weapons—that is, whether they were "capable of causing death or serious bodily injury" in the manner of their use or intended use during the assault. In this regard, appellant points to the evidence showing that (1) the assault occurred in a car and therefore appellant was prevented from swinging the bat and, instead, only jabbed at Christian as if "spear fishing"; (2) emergency medical personnel did not treat Christian's injuries, he received no stitches, no medical records were admitted at trial, and Keeley testified that the only injuries she observed the day after the assault were "little scrapes and bruises."

While the evidence showed that the assault took place in a confined space which prevented appellant from swinging the bat, it also showed that Christian was in close physical proximity to appellant and had little opportunity to defend himself against being struck by the bat. The jury heard evidence that appellant repeatedly jabbed at Christian's head and arms with the bat, that Christian had to press himself against the car door in an attempt to take the blunt force with his arms, that when he attempted to flee the car he could not open the door, and that he thought he was going to die. *See Romero*, 331 S.W.3d at 83 (noting jury may consider, among other factors, victim's testimony that he feared death or serious bodily injury and physical proximity of parties in determining whether object is deadly weapon). Detective Wright, a sixteen-year veteran of the Pasadena Police Department, testified that a baseball bat is not designed to be a deadly weapon but that, based on her experience, it could be used as one because "[a]ll it takes is a strike in the right place in the head to kill a person with a baseball bat." *See id.* (listing testimony regarding weapon's potential for causing death or serious bodily injury as another factor jury may consider in deadly weapon determination).

With regard to appellant's assertion that Christian did not sustain serious injuries, the State only needed to prove that the manner in which appellant used or intended to use the brass knuckles and baseball bat was capable of causing death or serious bodily injury. *See Moore*, 520 S.W.3d at 908. The jury heard evidence that

appellant repeatedly punched Christian with the brass knuckles from his waistline to the top of his head. Christian testified that, when appellant struck him with the knuckles, he felt as if he had been hit with a "metal bar" or "metal pole." At the time of trial, Christian still bore a scar on his hand where appellant had struck him with the knuckles. Photos admitted at trial showed that Christian sustained a gash to the top of his head, a laceration on his hand, a laceration on his ear where his earring was ripped out and bruising to his chest and neck. Emergency medical personnel evaluated Christian's injuries and told him that although he "could have used stitches" for the gash on his head, stiches were not an option because the injury was a tear rather than a cut. Officer Turner testified that when he made contact with Christian, he was "covered in blood . . . pretty much head to toe . . . on his face, head, arms and legs, chest, [and] torso." Here, appellant's use of brass knuckles and a baseball bat could have resulted in striking Christian in the eye, temple, or other area of the head that could have resulted in a serious or fatal head or eye injury. *See id.*

The evidence established that in the manner in which appellant used or intended to use the knuckles and baseball bat—by punching Christian in the head and by striking, jabbing, and spearing him in the head—both weapons were capable of causing death or serious bodily injury. There was no affirmative and directly germane evidence from which a rational jury could have found that if appellant was guilty, he was guilty only of either the lesser offense of robbery or the lesser offense

14

of misdemeanor assault. *See Cavazos*, 382 S.W.3d at 385. Therefore, appellant was not entitled to instructions on these offenses, and the trial court did not err in refusing to submit these instructions to the jury. *See Barnett v. State*, 344 S.W.3d 6, 16 (Tex. App.—Texarkana 2011, pet. ref'd) (finding no evidence from which rational jury could convict defendant of lesser-included offense of assault, instead of aggravated assault, where evidence did not negate allegation that defendant used deadly weapon during assault); *see also Mass v. State*, No. 01-12-01004-CR, 2014 WL 298439, at *5 (Tex. App.—Houston [1st Dist.] Jan. 28, 2014, no pet.) (mem. op., not designated for publication) (holding trial court did not err in refusing to instruct jury on lesser offense of misdemeanor assault, in defendant's trial for aggravated robbery, where record did not contain affirmative evidence that would have permitted rational jury to find that defendant did not use deadly weapon in committing assault).

Accordingly, we overrule appellant's first and second points of error.

## Conclusion

We affirm the trial court's judgment.

Russell Lloyd
Justice

Panel consists of Justices Keyes, Bland, and Lloyd.

Do not publish. TEX. R. APP. P. 47.2(b).

15